UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

MATTATHIAS SCHWARTZ,

               Plaintiff,

     v.

UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION,

               Defendant.

-------------------------------------------------------------------x

NOT FOR PUBLICATION
**REDACTED**
**MEMORANDUM & ORDER**
13-CV-5004 (CBA) (RML)

**AMON, Chief United States District Judge:**

Plaintiff Mattathias Schwartz, an investigative journalist freelancing for the New Yorker

magazine, brings this action to compel the U.S. Drug Enforcement Administration ("DEA") to

disclose certain records related to a Freedom of Information Act ("FOIA") request he filed on

August 27, 2012. This Memorandum and Order addresses Schwartz's specific request for

production of a portion of a video, taken by a government surveillance plane, depicting a drug

interdiction operation near Ahuas, Honduras, in which four civilians were killed (hereafter, the

"Ahuas Video" or "Video"). Schwartz originally sought the entire Video, but subsequently

narrowed his request to "the portion of the Ahuas Video that takes place after the tracked aircraft

touches down at the airstrip." (D.E. # 67 at 1.)[1] Based on its claim that production of the Ahuas

Video would reveal previously unknown law enforcement techniques and procedures, the DEA

withheld the Video under FOIA Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), and moved for

summary judgment. Schwartz cross-moved seeking disclosure and opposed the DEA's motion

by arguing that the DEA has not supported its reliance on Exemption 7(E), had failed to conduct

---

[1] Schwartz later filed an additional letter clarifying that he narrowed his request with respect to the Video only and
not his larger FOIA request for numerous other DEA records. (See D.E. # 68.) This Memorandum and Order
addresses only Schwartz's request for the portion of the Video.

1

a reasonable search for responsive documents and had exhibited bad faith in responding to his FOIA request.

This case proceeds within a FOIA regime that reflects "a general philosophy of full agency disclosure," Dep't of the Air Force v. Rose, 425 U.S. 352, 360 (1976) (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)), requiring "all doubts [to be] resolved in favor of disclosure," Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988). Despite extensive litigation and four relevant declarations—including one filed ex parte and under seal—the DEA has failed to identify previously unknown techniques and procedures that would be exposed by disclosure of the limited portion of the Ahuas Video that Schwartz seeks.

Accordingly, because there are no further disputed issues of fact, the Court grants Schwartz's motion for summary judgment and orders the DEA to produce the requested portion of the Video, as ordered redacted below, see infra at 35–36.

## BACKGROUND

In April 2012, following a request from the Honduran government, the DEA and the Tactical Response Team of the Honduran National Police commenced Operation Anvil, a joint operation designed to disrupt and interdict traffickers in northeastern Honduras. (See D.E. # 38, "First Wedoff Decl.," Ex. J.) The DEA provided both support and training for the Honduran police and personnel in the form of an elite DEA unit known as the Foreign-Deployed Advisory Support Team ("FAST"). (See id. Exs. H–J, Q.)

### A.    The Ahuas Incident

On the night of May 11, 2012, a small aircraft suspected to be carrying contraband was detected in rural Honduras. (See D.E. # 45, "Second Soiles Decl." ¶ 26.) Agents from FAST, along with Honduran police officers, were dispatched in helicopters to intercept the suspected

traffickers. (See First Wedoff Decl. Exs. H, L.) Overhead, a surveillance plane operated by U.S. Customs and Border Protection ("CBP") covertly tracked the aircraft and observed it landing in a remote airstrip near the village of Ahuas in the early hours of the morning. (See id. Exs. F, H, L.) Dozens of men met the plane and worked quickly to transfer its cargo—later determined to be cocaine—to waiting trucks. (See id. Exs. H, L.) The trucks then drove the drugs down to the nearby Patico River and re-loaded them onto a motorized canoe. (See id. Exs. H, L, P.) As helicopters carrying the DEA agents and Honduran officers closed in on the riverbank, the drug traffickers fled and abandoned their now-cocaine-laden canoe. (See id.) When law enforcement boarded the canoe, they found more than 400 kilograms of cocaine. (See id.) While officers struggled to start the canoe's motor, a larger riverboat struck the front of the canoe. (See id.) Apparently believing that they had been ambushed, officers both on the canoe and in a circling helicopter opened fire on the larger boat. (See id.) As it later turned out, the four resulting casualties were in fact not traffickers but unarmed villagers. (See id. Exs. H, I, M.)

In January 2013, 58 members of Congress called for further investigation into the DEA's role in the deaths. (See id. Ex. I.) In July 2013, the DEA sent a letter in response, reporting that the DEA's Office of Investigations had conducted an internal review and concluded that no American agents fired their weapons during the Ahuas Incident. (See id. Ex. J.)

### B. The Ahuas Video

The CBP-operated surveillance plane that initially tracked the smugglers also recorded a video of the entire interdiction operation, including the moments when the officers opened fire on the larger boat. (Second Soiles Decl. ¶¶ 3, 26; First Wedoff Decl. Exs. H, P.) In response to the public outcry caused by the civilian deaths, the DEA screened the Ahuas Video for members of Congress and briefed them on the DEA's role in the Ahuas Incident. (First Wedoff Decl. Exs. H, P.)

An undisclosed source permitted Thom Shanker and Charlie Savage, reporters from the New York Times, to view the Ahuas Video. (Id. Ex. P.) In an article titled "Video Adds to Honduran Drug Raid Mystery," Shanker and Savage provided a play-by-play of the moments leading up to the fatal shooting. (Id.)

## C. Schwartz's FOIA Request

On August 27, 2012, Schwartz made a FOIA request for: (1) documents related to "an operation that took place in or around the town of Ahuas, Honduras on May 10 and/or May 11, 2012"; (2) documents related to "any subsequent investigation" of the Ahuas Incident; (3) all "video recording and digital images" of the Ahuas Incident; (4) internal documents from the DEA Office of Investigations, the DEA Review Board, and the DEA Office of Professional Responsibility; and (5) all "Reports of Shooting Incidents" that took place "in Honduras or Honduran territorial waters" from January 1, 2012, to August 27, 2012. (D.E. # 30, "First Myrick Decl.," Ex. A; D.E. # 32, "Def.'s Rule 56.1," ¶ 1.) Schwartz and the DEA corresponded on the timing of his request for nearly a year, culminating in Schwartz's August 2, 2013, letter to the DEA appealing its constructive denial of his request and requesting a response within 20 days. (First Myrick Decl. Ex. D; Def.'s Rule 56.1 ¶ 4.) After receiving no response, Schwartz filed the instant action on September 6, 2013.

A month after Schwartz initiated this lawsuit, the DEA made an initial production of 12 pages of documents and withheld 148 pages of documents and one CD-ROM. (First Myrick Decl. Ex. G; First Wedoff Decl. Ex. E; Def.'s Rule 56.1 ¶ 7.) That initial release consisted solely of a handful of publicly available news articles regarding the Ahuas Incident. (See First Wedoff Decl. Ex. E.) Nearly eight months later, on June 20, 2014, the DEA released an additional 329 pages of heavily redacted documents and withheld entirely 135 additional pages and the Ahuas Video. (See First Myrick Decl. Ex. H; First Wedoff Decl. Ex. G; Def.'s Rule 56.1 ¶ 9.) To

4

justify its withholdings, the DEA invoked five provisions of the so-called "law enforcement" exemption—Exemption 7.[2] (First Myrick Decl. Exs. G, H.) It later clarified, however, that it withheld the Ahuas Video based solely on Exemption 7(E). (See D.E. # 46, "Nov. 13, 2014, Hr'g Tr.," at 3:2–22.)

### D. Motion Practice

The FOIA request here has been the subject of lengthy motion practice, numerous rounds of supplemental filings including an ex parte submission by the DEA, and in camera review by the Court of the disputed video. Following this motion practice, Schwartz narrowed his request with respect to the Ahuas Video to only the portion "that takes place after the tracked aircraft touches down at the airstrip." (D.E. # 67 at 1.) In doing so, Schwartz mooted the DEA's arguments for withholding the portion of the Ahuas Video dealing with the identification and tracking of the smuggling plane. The Court therefore does not address those arguments. The remaining arguments raised by the parties in their various motion papers are summarized below.

1.   Motion for Summary Judgment

In its summary judgment motion, the DEA argued that each of the records withheld, in whole or in part, was exempt from FOIA disclosure under the law enforcement exemption. (D.E. # 28.) In support of that motion, it submitted two declarations: one from Katherine Myrick, Chief of the FOIA and Privacy Act Unit (First Myrick Decl.), and another from Special Agent James Soiles, Deputy Chief of Operations for the Office of Global Enforcement (D.E. # 31, "First Soiles Decl."). The First Myrick Declaration provided an overview of Myrick's qualifications, (First Myrick Decl. ¶¶ 1–2); the DEA's law enforcement mission, (id. ¶¶ 5–7); the

---

[2] The initial response also erroneously indicated that documents were withheld subject to subsection (j)(2) of the Privacy Act, 5 U.S.C. § 552a. (First Myrick Decl. Ex. G.) The DEA later clarified that it does not rely on the Privacy Act to justify its withholdings.

procedural history of and correspondence related to Schwartz's FOIA request, (id. ¶¶ 8–19); the search performed for responsive records, (id. ¶¶ 20–28); and described, in exceedingly general terms, the exemptions underlying each of the DEA's withholdings, (id. ¶¶ 32–33 (Exemption 7), ¶¶ 34–45 (Exemption 7(A)), ¶¶ 46–48 (Exemption 7(C)), ¶¶ 49–50 (Exemption 7(D)), ¶¶ 51–54 (Exemption 7(E)), ¶¶ 55–56 (Exemption 7(F)). For example, the justification for withholding the Ahuas Video read in its entirety:

> Release of that record would easily identify techniques and procedures involved in operations, including tracking and observation methodologies and coordination and tactical procedures. The disclosure of these techniques and procedures would enable criminal investigative subjects to identify law enforcement capabilities and limitations, thereby enabling them to improve evasive measures and otherwise modify existing vulnerabilities in their activities. As such, disclosure of the video that Plaintiff requested would enable circumvention of law enforcement efforts.

(Id. ¶ 53.) Finally, Myrick explained that the responsive records were "examined to determine whether any reasonably segregable information could be released after applying exemptions to each record while considering the foreseeable harm that release would pose to interests protected by such exemptions." (Id. ¶ 57.) And similarly, the First Soiles Declaration largely summarized Soiles's resume and provided some basic information about drug trafficking through Honduras. (First Soiles Decl. ¶¶ 1–5, 7.) It then stated that Soiles had reviewed the requested records and determined "from [his] evaluation and based on [his] professional law enforcement experience and expertise, that release of the responsive records to which FOIA Exemption (b)(7)(A) is applied could reasonably be expected to interfere with certain pending enforcement proceedings of which [he is] aware and about which [he is] briefed on a regular basis." (Id. ¶ 8.) To the extent additional information was required, Soiles offered to provide it only on an in camera and ex parte basis. (Id.)

6

On July 28, 2014, Schwartz opposed the DEA's motion, principally contending that the DEA's motion must be denied because its declarations were too conclusory to support sufficiently the claimed exemptions. (D.E. # 37, "Opp. Br.") He also cross-moved for summary judgment, arguing that the withheld documents should be produced both because the law enforcement exemption does not, in fact, apply and due to the DEA's misconduct in handling his FOIA request. In support of that submission, Schwartz attached as exhibits or otherwise referenced numerous publicly available news reports regarding the DEA FAST teams as well as several similar surveillance videos depicting overseas drug interdiction efforts by American law enforcement. (First Wedoff Decl. ¶¶ 9–25 & Exs. H–U.) Most relevant to the dispute over the Ahuas Video, Schwartz provided a copy of a surveillance video of an interdiction operation in Jamaica that was previously disclosed by the DEA, (id. ¶ 25 & Ex. U) (hereinafter the "Jamaica Video"), as well as a CNN report on DEA operations in Honduras that included a brief video recorded by a U.S. surveillance plane, (id. ¶ 21 & Ex. S) (hereinafter "Narco Wars"). Based on those videos and other publicly available sources, Schwartz argued that Exemption 7(E) did not support the DEA's withholding of the Ahuas Video because any techniques or procedures that might be revealed by viewing it were already known to the public. (Opp. Br. at 30–31.) He further argued that the DEA had failed to comply with its FOIA obligations in good faith. (Id. at 35–41.) Specifically, he alleged that the DEA misled the Court by falsely claiming that it would submit a Vaughn index, unduly delayed its response, and conducted an inadequate search for responsive records. (See id.) The DEA disputed each of those claims.

2.    Oral Argument

The Court heard initial oral argument on the motions on November 13, 2014. At argument, the DEA clarified that it was seeking to withhold the Ahuas Video solely under

7

Exemption 7(E).[3] (Nov. 13, 2014, Hr'g Tr. at 3:2–22.) Relying on the Myrick and Soiles Declarations, the DEA argued that disclosing the Ahuas Video would reveal enforcement techniques and procedures not currently known to the public. (Id. at 3:23–4:24.) But as the vague and conclusory nature of those declarations failed to grapple with the specific sources Schwartz supplied, the Court found that it was unable to conduct the de novo review mandated by FOIA. (Id. at 5:5–7:6, 9:8–11:21.)

The Court therefore directed the DEA to submit a supplemental declaration describing the withheld documents in greater detail, linking those documents to the particular exemptions claimed, and justifying the use of those exemptions in non-conclusory terms. (See id.) Given that the Ahuas Video constituted the core of Schwartz's FOIA request, the Court directed the DEA to submit a supplemental declaration addressing why it was exempt from FOIA disclosure before addressing the remainder of the requests. (Id. at 13:3–14:6.) Specifically, the Court instructed the DEA to explain how the techniques and procedures depicted in the publicly available sources Schwartz identified materially differed from any revealed in the Ahuas Video. (See id. at 5:5–7:6.)

3.    Supplemental Briefing

On December 5, 2014, the DEA submitted a supplemental declaration from Special Agent Soiles identifying, in general terms, eight law enforcement techniques and procedures purportedly depicted in the Ahuas Video:

> a) the deployment of, and tactical interactions among, air, water, and ground law enforcement assets; b) law enforcement insertion and departure at night; c) law enforcement's use of intelligence, surveillance, and reconnaissance during an actual anti-drug law enforcement interdiction operation; d) aerial tracking

---

[3] In one sentence of the First Myrick Declaration, the DEA had claimed that Exemption 7(C) also applied to the Ahuas Video. (See First Myrick Decl. ¶ 57.) At oral argument, defendant's counsel expressly stated that it had waived any reliance on Exemption 7(C) as a basis to withhold the video. (See Nov. 13, 2014, Hr'g Tr. at 3:2–16.)

> methodologies, techniques, and procedures including following
> distances, air speeds, altitudes, and camera usage; e) aerial
> mobility capability; f) observation and video recording
> methodologies, techniques, and procedures; g) interagency and
> international coordination procedures; and h) tactical procedures
> regarding night time aerial operations.

(Second Soiles Decl. ¶ 6.) Soiles claimed that "[a]n informed drug trafficker viewing the video

could readily identify these techniques and procedures, and ascertain the tactics law enforcement

used to address the specific challenges posed by this particular type of operation." (Id. ¶ 5; see

id. ¶¶ 4–5, 7–10 (arguing that such disclosure would aid criminals in circumventing or

undermining law enforcement efforts).) Further, he contended that "disclosure of interagency

and international coordination procedures [in the Ahuas Video] also discloses priorities and

resources" thereby allowing traffickers to "adjust[] their criminal activities" to avoid detection.

(Id. ¶ 11.) Soiles summarily stated that such disclosure would put the "lives and safety of law

enforcement . . . at an even greater risk" by "eras[ing] the crucial element of surprise."[4] (Id.

¶ 12.)

  In response to the publicly available materials that Schwartz identified, Soiles claimed

that "[n]one of [those] Exhibits, or even all of the Exhibits together, reveals the same techniques

and procedures that would be disclosed if the [Ahuas Video] were released." (Id. ¶ 14.) Soiles

responded that unlike the Ahuas Video, which recorded an entire drug interdiction operation,

Narco Wars captured a skirmish between the Honduran navy and traffickers that was limited in

both scope and duration. (Id. ¶¶ 25–26.) He further noted that the U.S. Embassy in Honduras—

not the DEA—released the Narco Wars recording. (Id. ¶ 25.) Soiles similarly concluded that the

---

[4] Despite that claim, the DEA has explicitly (and repeatedly) disclaimed any reliance on Exemption 7(F), which allows agencies to withhold law enforcement records or information if disclosure "could reasonably be expected to endanger the life or physical safety of any individual," 5 U.S.C. § 552(b)(7)(F). (See, e.g., Nov. 13, 2014, Hr'g Tr. at 3:2–22.)

enforcement effort depicted in the Jamaica Video was distinguishable both because it occurred during the day in a relatively small and well-defined urban neighborhood and because that raid was carried out by the Jamaican security forces, not the DEA. (Id. ¶¶ 49–54.) He likewise dismissed as irrelevant a third video showing the Honduran navy (together with American military forces) capturing a smuggling submarine because it offered only a "fleeting glance" into law enforcement, which stood in sharp contrast to the hours of footage captured in the Ahuas Video. (Id. ¶¶ 28–32.)

The remaining sources—media reports of the DEA's operations in Afghanistan and the Ahuas Incident—Soiles found to be equally inapposite. He explained that the DEA faces different challenges in Afghanistan and the techniques and procedures utilized there "differ significantly" from those employed in Honduras because the DEA operates in the former with "substantial military support" that is absent in Central America. (Id. ¶¶ 34–48.) And as the DEA neither wrote nor endorsed any of the media reports on the Ahuas Incident, Soiles argued they did not reveal "sensitive law enforcement techniques and procedures" of the type disclosed in the Ahuas Video. (Id. ¶¶ 55–65.) He concluded by noting once again that the DEA could provide additional information to the Court ex parte and in camera. (Id. ¶ 69.)

In opposition, Schwartz filed a supplemental brief in which he noted that unlike documents that explicitly describe law enforcement techniques or procedures (like manuals or technical handbooks), disclosure of a video does not necessarily disclose all techniques and procedures depicted therein. (See D.E. # 54, "Pl. Corr. Supp. Br.," at 22–25.) Rather, he argued that videos may be withheld under Exemption 7(E) only to the extent a viewer could discern such techniques and procedures by watching the footage. Based on that conclusion, Schwartz questioned the extent to which watching a single "interdiction effort that took place nearly three

10

years ago would meaningfully educate the viewer on the techniques and procedures' substance." (Id. at 24.)

Moreover, even if the Ahuas Video does disclose some techniques and procedures, Schwartz argued that it still must be produced because the public already knows each of the eight techniques and procedures identified in the Second Soiles Declaration. To support that claim, Schwartz provided publicly available (1) technical specifications of the P-3 Orion (the surveillance plane that he claimed recorded the Ahuas Video) and details about how that aircraft is used in interdiction operations, (D.E. # 49, "Second Wedoff Decl.," ¶¶ 21–27, 30 & Exs. E–K); (2) videos depicting the interior of the P-3 Orion and its surveillance equipment, (id. ¶¶ 13, 28); (3) numerous additional surveillance videos recorded by the P-3 Orion or CBP, (id. ¶¶ 3–13, 29); (4) other videos related to American drug interdiction efforts, (id. ¶¶ 15–16); and (5) a television program about the DEA specifically, (id. ¶¶ 18, 20 & Ex. C). Notably, one of those videos, a National Geographic program entitled "Border Wars: Midnight Drug Run," depicts how a CBP-operated surveillance plane located a potential smuggling boat in the Miami Harbor, tracked it, and coordinated its interception by other law enforcement agents. (See id. ¶ 13.) Finally, Schwartz correctly noted that the DEA had failed to address specifically whether there are reasonably segregable portions of the Ahuas Video, as required under FOIA.

After obtaining leave to do so, the DEA filed a supplemental brief (D.E. # 56, "DEA Supp. Br.") and another declaration from Special Agent Soiles (D.E. # 57, "Third Soiles Decl.") on February 13, 2015. As an initial matter, the DEA appeared to argue that any techniques and procedures depicted in a video could justify a withholding and noted that, contrary to Schwartz's claims, courts regularly approve agency withholding of videos and recordings under Exemption 7(E) without considering whether a viewer could discern techniques and procedures by watching the footage, as Schwartz proposed. (See DEA Supp. Br. at 4–5.) It further noted that

distinguishing between depiction of a technique, on the one hand, and disclosure, on the other was untenable, "irrational," and "[i]f taken to its extreme . . . almost nothing would be protectable under Exemption 7(E) other than the actual manuals providing line-by-line directions of procedures or instruction videos of techniques." (Id. at 4.)

Soiles then made plain that the DEA was withholding "each second" of the Ahuas Video because non-public law enforcement techniques and procedures "infuse the entire video." (Third Soiles Decl. ¶ 5.) According to Soiles, none of the publicly available sources identified by Schwartz "features comparable . . . techniques[] and procedures" or "features interagency and international law enforcement coordination procedures involving the DEA and DEA partner agencies." (Id. ¶ 7.) Nor did any of those sources "show[] an unfiltered interagency operation from beginning to end." (Id.)

In an attempt to then distinguish the videos Schwartz proffered, the Third Soiles Declaration repeated the following purported distinctions for each:

- "It does not appear that the video was officially posted by the DEA."
- "The video does not depict the Ahuas Operation."
- "It does not appear to feature any DEA asset."

(Id. ¶¶ 8–18, 20–23.) Soiles then similarly repeated that the majority of the videos were additionally distinguishable because:

- "It does not show law enforcement coordination between the DEA and another law enforcement agency, domestic or foreign." (Id. ¶¶ 8–18, 20, 23 (13 videos).)
- "The technology used to record the video differs from that used to record the requested video." (Id. ¶¶ 8–17, 20, 23 (12 videos).)[5]

---

[5] By noting that only some of the videos Schwartz presented were recorded using technology that differed from the Ahuas Video, the Third Soiles Declaration implies that others are technologically identical to the Ahuas Video.

- "It does not show in-air, clandestine tracking of an aircraft." (Id. (12 videos).)
- "It does not provide any insight into aerial tracking techniques and procedures such as following distances, air speeds, altitudes, and camera usage." (Id. ¶¶ 8–10, 15–17, 20 (7 videos).)

Finally, Soiles claimed that one video did not depict a drug interdiction operation at all. (Id. ¶ 10.) He did not, however, provide factual support for these claims. Nor did he explain in even general terms how the technology in the videos that Schwartz identified differed from that used for the Ahuas Video, for example by claiming that a different camera, aircraft, or detection system was employed.

### 4. Second Oral Argument

The Court held another round of oral argument on April 20, 2015. At that argument, the DEA claimed, for the first time, that the manner in which the Ahuas Video was created—not just its contents—justified its withholding under Exemption 7(E). (D.E. # 61, "Apr. 20, 2015, Hr'g Tr.," at 9:23–11:4.) Because the DEA reiterated its position that some (or possibly all) of the eight techniques and procedures it identified permeated every second of the footage, the DEA argued that the Video was entirely exempt from disclosure under FOIA. (Id. at 2:19–3:25.)

On the question of whether the techniques and procedures were publicly available, the DEA stood by its position that only official acknowledgement could waive Exemption 7(E), without addressing the numerous cases finding that publicly known techniques and procedures fall outside the scope of that Exemption. (See id. 12:25–13:18.) Upon questioning, however, the DEA appeared to retreat from that position and instead claimed that the Third Soiles Declaration established that the specific techniques and procedures depicted in the Ahuas Video are not publicly known. (Id. at 13:19–14:12.) Although the DEA recognized that Schwartz had identified a number of purportedly similar videos, it argued that the techniques and procedures

13

depicted in those recordings differed from those in the Ahuas Video. (Id. at 14:17–23.) Based on Soiles's knowledge of the DEA's law enforcement operations, the DEA argued, the Court should accept his representations to that effect as true. (See id. at 7:11–18.) But as Schwartz's counsel correctly noted, the Court may not simply accept such representations as true in the face of conflicting evidence in the record, i.e. the publicly available materials Schwartz identified. (See id. at 7:5–10.) Because the general and conclusory claims made by Soiles left the Court unable to decide the pending motion, the Court again directed the DEA to provide supplemental briefing. (See id. at 7:19–8:25, 17:15–20.) But because the DEA was insistent that it could not publicly provide the level of granularity needed to decide the pending motion, the Court instructed it to provide the Ahuas Video for in camera review and to submit an ex parte declaration both identifying the specific techniques and procedures at issue and distinguishing the publicly available videos in the record. (See id.)

5.     Ex Parte Submission and In Camera Review

Ultimately, the DEA provided the Court with a complete copy of the Ahuas Video and a 20-page ex parte declaration by Agent Soiles ("Fourth Soiles Decl.") for in camera review. The DEA also proposed presenting the Ahuas Video along with ex parte testimony by a live witness. (See D.E. # 62.) At a subsequent telephone conference, however, the DEA confirmed that all information relevant to its withholdings under Exemption 7(E) was provided in its declarations, and the Court therefore denied its request to provide ex parte testimony as unnecessary. (D.E. dated June 22, 2015.) The Court reviewed the entire Video, including specifically the portion Schwartz seeks, which begins when the tracked aircraft touches down at the airstrip.

The Court also reviewed the Fourth Soiles Declaration, submitted ex parte and under seal. This declaration purported to identify the specific techniques and procedures that would be disclosed if the Ahuas Video were revealed. Soiles divided those techniques and procedures into

14

two categories: ones related to video recording and ones related to drug interdiction operations. Within those categories, Soiles noted a number of techniques and procedures related to clandestine aerial tracking. (See Fourth Soiles Decl. ¶¶ 13–16, 30–33.) As noted above, Schwartz subsequently limited his FOIA request to exclude the portions of the Ahuas Video depicting such tracking efforts. (D.E. # 67 at 1.) Therefore those techniques and procedures are no longer relevant, and the Court need not further consider those portions of the Fourth Soiles Declaration.

In the category of techniques and procedures related to recording, Soiles claimed that release of the Ahuas Video would reveal that:

- ███████████████████████████████████, (Fourth Soiles Decl. ¶¶ 8–9);

- The cameras available to law enforcement, (id. ¶ 20(a)), and how those cameras are used in nighttime drug interdiction operations, (id. ¶¶ 18–19, 20(b));

- The technological capabilities of the camera used, including the fact that ██████ ███████████████████████ (id. ¶¶ 20(c), 21, 23); and

- The limitations of the camera used, (id. ¶¶ 22, 26–27).

Despite claiming that the recording equipment here is "state-of-the-art," Soiles did not provide any specific information regarding how the technical features of the camera here differed from either the equipment used in the prior videos Schwartz identified or from commercially available cameras. Rather, he described those techniques and procedures in only the most conclusory and general terms.

15

On the second category of techniques and procedures—those related to the efforts of the "on-the-ground interdiction team"—Soiles claimed that release of the Ahuas Video would reveal:

- ████████████████████████, (id. ¶ 34), and the limits of the DEA's surveillance capability, (id. ¶ 37);

- Details regarding the law enforcement assets and equipment deployed for the Ahuas Operations, (id. ¶¶ 38–39);

- Tactical interactions between air, water, and ground law enforcement assets, (id. ¶ 41), and how those assets supported the surveillance plane, (id. ¶ 35);

- That ███████████████████████████████████ in the Ahuas Operation, (id. ¶ 36);

- The specific tasks taken on by law enforcement officers and how many officers were assigned to each task, (id. ¶ 40); and

- That ████████████████████████████████████, (id. ¶ 42), and ██████████████████, (id. ¶ 43).

Soiles's description of the operational techniques and procedures consisted almost entirely of general and conclusory claims devoid of specific factual details.

Finally, the Fourth Soiles Declaration argued that any techniques or procedures depicted in the Jamaica Video and Border Wars were distinguishable because:

- Both were overt—rather than clandestine—recordings of interdiction operations, (id. ¶ 29(A)(1), (A)(4), (B)(2)–(3));

- The Jamaica Video "was recorded during the daytime," (id. ¶ 29(A)(2));

- The Jamaica video "depicts an operation in a heavily populated, residential neighborhood," (id. ¶ 29(A)(3)), which "included a physical breach of the suspect's compound by Jamaican police," (id. ¶ 29(A)(5));

- The Jamaica Video "features outdated camera recording technology," (id. ¶ 29(A)(7);

- The Border Wars video "shows only a high speed boat chase on open water," (id. ¶ 29(B)(1)); and

- Border Wars "shows only brief glimpses of the identification of a smuggling boat," (id. ¶ 29(B)(4), and only "the briefest of glimpses of current recording technology . . . cropped in such a way that no data are visible," (id. ¶ 29(B)(5)).

Soiles then summarily stated that the federal agency that permitted Border Wars to be released took efforts to ensure that it did not reveal law enforcement techniques, procedures, or the full scope of law enforcement's capabilities. (Id. ¶ 29(B)(6)–(10)). He further stressed that none of the sources identified by Schwartz was officially disclosed by the DEA. (Id. ¶¶ 56–59.)

## DISCUSSION

"FOIA was enacted to facilitate public access to Government documents . . . and was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 283 (2d Cir. 2009) (internal quotation marks and citations omitted). FOIA establishes a default rule of disclosure: agencies must hand over responsive records unless they "fall within one of the specific, enumerated exceptions set forth in the Act." Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. D.O.J., 697 F.3d 184, 194 (2d Cir. 2012) (quoting Nat'l Council of La Raza v. D.O.J., 411 F.3d 350, 355–56 (2d Cir. 2005)); see 5 U.S.C. § 552(d) ("This section does not authorize withholding of information or limit the availability of records to the public, except as specifically

stated in this section."). To ensure FOIA's goal of administrative transparency, the Supreme Court has instructed that FOIA's exemptions must be confined to the statutory text and that the text must be narrowly construed. See, e.g., Milner v. Dep't of the Navy, 562 U.S. 562, 565 (2011) (limiting Exemption 2 to its text). Consistent with that policy favoring disclosure, the Second Circuit has made plain that courts must give broad effect to FOIA's statutory command to open government files, while reading its exemptions narrowly. See Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999).

## I.    Standard of Review

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must "view the evidence in the light most favorable to the party opposing summary judgment, [] draw all reasonable inferences in favor of that party and [] eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)).

Under FOIA, a defendant seeking summary judgment bears "the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. D.O.J., 19 F.3d 807, 812 (2d Cir. 1994). Since "[a]ffidavits submitted by an agency are accorded a presumption of good faith . . . discovery . . . generally is unnecessary if the agency's submissions are adequate on their face." Id. (internal quotation marks and citation omitted). Therefore, summary judgment may be granted on the basis of agency affidavits or declarations "if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by

18

evidence of agency bad faith." Grand Cent. P'ship, 166 F.3d at 478 (emphasis, internal quotation marks, and citation omitted).

That presumption of good faith does not, however, weight the scales in favor of withholding. See Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143, 147 (2d Cir. 2010) (noting that FOIA operates under a "presumption for disclosure"). Rather, the presumption of good faith serves to streamline FOIA cases by making explicit that uncontradicted agency declarations satisfy the prima facie showing demanded by Federal Rule of Civil Procedure 55(c). But it does not change the fact that "[t]he agency's decision that the information is exempt from disclosure receives no deference." Id. To the contrary, review is de novo, 5 U.S.C. § 552(a)(4)(B), and the agency always "bears the burden of establishing that any claimed exemption applies," Long v. Office of Pers. Mgmt., 692 F.3d 185, 190 (2d Cir. 2012).

Once the agency makes that showing, a plaintiff must "provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." Carney, 19 F.3d at 812; see also Irizarry v. Catsimatidis, 722 F.3d 99, 103 n.2 (2d Cir. 2013) ("The nonmoving party must set forth specific facts showing that there is a genuine issue for trial." (quoting Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008))). On the other hand, the agency's failure to shoulder its burden of showing a valid exemption does not result in an automatic grant of judgment for the requester. Citizens for Responsibility & Ethics in Wash. v. D.O.J., 746 F.3d 1082, 1099 (D.C. Cir. 2014). Rather, the plaintiff's entitlement to relief depends on a three-part showing that the agency "has (1) improperly, (2) withheld, (3) agency records." Grand Cent. P'ship, 166 F.3d at 478 (internal quotation marks and citation omitted). "Only when each of these criteria is met may a district court force an agency to comply with the FOIA's disclosure requirements." Id.; see also 5 U.S.C. § 552(a)(4)(B).

## II.     The DEA's Motion for Summary Judgment as to the Ahuas Video

The DEA argues that the Ahuas Video falls under Exemption 7(E) because its production would reveal certain unknown investigatory techniques and procedures.  As a threshold matter, Exemption 7(E)—like all subsections of Exemption 7—requires a showing that the records in question were compiled for a law enforcement purpose.  See John Doe Agency v. John Doe Corp., 493 U.S. 146 (1989).  In the Second Circuit, the government need show only that a law enforcement agency compiled the records during a criminal investigation.  See, e.g., Ferguson v. F.B.I., 957 F.2d 1059, 1070 (2d Cir. 1992)).  The Ahuas Video, which depicts a law enforcement operation and was recorded by a law enforcement aircraft, plainly clears that modest bar.

### A.     Exemption 7(E) Allows an Agency to Withhold Records that Disclose Non-Public Law Enforcement Techniques or Procedures

Under Exemption 7(E), agencies may refuse to disclose "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law . . . ." 5 U.S.C. § 552(b)(7)(E).  "Techniques and procedures" refer to how officials investigate a crime.  Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec., 626 F.3d 678, 682 (2d Cir. 2010).  Specifically, a "technique" is "a technical method of accomplishing a desired aim," and a "procedure" is "a particular way of doing or of going about the accomplishment of something."  Id. (quoting Webster's Third New Int'l Dictionary (1986)).  "Guidelines," on the other hand, are "an indication or outline of future policy or conduct" that implicate "resource allocation."  Id.

20

1. <u>The Scope of Exemption 7(E)</u>

The parties urge contrasting interpretations of the breadth of Exemption 7(E). Schwartz argues that the facts surrounding an application of a known technique are not protectable. (Pl. Corr. Supp. Br. at 23.) He calls this "objective fact evidence," and he argues that video recordings and digital images fall within this category. (<u>See</u> <u>id.</u> at 23–24.) The DEA argues that the unknown circumstances surrounding the application of a known technique are protectable and that Schwartz's contrary interpretation reduces Exemption 7(E) to covering nothing but "actual manuals providing line-by-line directions of procedures or instruction videos of techniques." (<u>See</u> DEA Supp. Br. at 4, 7–14; <u>see also</u> D.E. # 35, "DEA Reply Br.," at 13; Fourth Soiles Decl. ¶ 12.) Both arguments fail from an oversimplification of the issue. Presenting new or unique facts alone does not make information protectable, but information that would disclose an unknown technique or procedure or unknown aspect thereof—including objective, factual information—may be withheld.

The text of the statute makes this plain. Records or information may be withheld "only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations." 5 U.S.C. § 552(b)(7)(E). Contrary to Schwartz's argument, the <u>type</u> of information is not relevant. What is relevant is only the effect of producing that information. But contrary to the DEA's argument, only previously unknown "techniques or procedures" are exempt. Previously unknown circumstances are not.

An example may help to clarify this distinction. Suppose that according to DEA procedure, law enforcement helicopters keep drug traffickers in sight for 10 minutes before landing. This procedure is not publicly known. A reporter files a FOIA request for a video in which a DEA helicopter follows this procedure, but the DEA withholds it. The reporter sues,

21

and the DEA explains to the Court that there is a procedure to wait 10 minutes, which this video discloses. That withholding would be upheld. But now suppose that this procedure is widely publicly known. The DEA still seeks to withhold the video, but now it argues that the video would reveal that the DEA used this widely known procedure in these particular circumstances. That reason alone would be insufficient. Unless the DEA identified something unknown about the procedure that would be revealed by its application to these circumstances, the withholding would not be upheld. Thus the only question is whether or not the information would reveal unknown techniques or procedures or unknown aspects thereof.

This hypothetical is reflected in the case law. For example, using pretext phone calls is a widely known law enforcement technique; the application of that widely known practice to the particular facts underlying a FOIA request is not protectable where it reveals no more than what is already known about the technique. See Rosenfield v. D.O.J., 57 F.3d 803, 815 (9th Cir. 1995). In contrast, using polygraph tests is also a widely known technique, but the particular facts of the questions asked, answers received, and results would reveal unknown aspects of that technique. See Piper v. D.O.J., 294 F. Supp. 2d 16, 29 (D.D.C. 2003). Those facts are therefore protectable. Id. at 30. Using surveillance cameras is another widely known technique or procedure. Although the location of a single surveillance camera would not reveal anything unknown about that technique, see Kubik v. U.S. Fed. Bureau of Prisons, No. 10-CV-6078 (TMC), 2011 WL 2619538 (D. Or. July 1, 2011), the location of every camera in a particular surveillance program would, see N.Y. Civil Liberties Union v. Dep't of Homeland Sec., 771 F. Supp. 2d 289 (S.D.N.Y. 2011). Exemption 7(E) protects the latter, but not the former.

This determination must be made on a case-by-case basis. Under different circumstances, the same fact may or may not be covered. For example, sometimes disclosing the internal codes in documents would reveal previously unknown aspects of a technique, but

sometimes it would not.  Compare Boyd v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 570 F. Supp. 2d 156 (D.D.C. 2008), with Families for Freedom v. U.S. Customs & Border Prot., 797 F. Supp. 2d 375 (S.D.N.Y. 2011) ("Families for Freedom I").  Similarly, the same well known technique may have previously unknown aspects exposed by some facts, but not others. See Families for Freedom v. CBP, 837 F. Supp. 2d 287, 296 (S.D.N.Y. 2011) ("Families for Freedom II") (how often and when Border Patrol checks specific trains is protectable, but the staffing statistics for those checks are not).  Courts apply the text of Exemption 7(E) to the particular facts before them to make these determinations.

Schwartz's conception is therefore too narrow, while the DEA's is too broad. Circumstances concerning the application of a technique are protectable where they reveal previously unknown techniques or previously unknown aspects of known techniques.  Previously unknown circumstances that do not reveal an unknown technique or anything new about a known technique, however, are not protectable.

### 2. Publicly Known Techniques and Procedures

The parties agree that Exemption 7(E) protects only law enforcement techniques and procedures that are not known to the public.  (See DEA Supp. Br. at 4 (noting that it is "undisputed . . . that 7(E) protects law enforcement techniques not generally known to the public").)  The dispute instead centers on what triggers that public-knowledge exception thereby rendering Exemption 7(E) inapplicable.  Schwartz contends that once the public becomes aware of information related to a technique or procedure—whatever the province of that disclosure— withholding under Exemption 7(E) is no longer justified.[6]  (See, e.g., Pl. Corr. Supp. Br. at 5–6.)

---

[6] It is not clear whether Schwartz relies on the Shanker and Savage New York Times article or his prior New Yorker article among these publicly available sources.  In any event, the Court does not consider the information in these reports on the Ahuas Incident in evaluating whether the techniques and procedures allegedly revealed by the Ahuas Video are publicly known.

The DEA, on the other hand, claims that "pursuant to the public domain doctrine, no press account, no media piece, not even release by another Federal agency, is sufficient to create a waiver of the agency's assertion of a FOIA exemption." (DEA Supp. Br. at 15–16; see also Second Soiles Decl. ¶¶ 35, 61, 67 (disclaiming any DEA approval or official acknowledgement of the sources Schwartz cites).) Instead, it argues that "the DEA has not officially identified the techniques and procedures in the Ahuas video . . . [and] [a]s such, the agency has not made those techniques and procedures known to the public and retains its prerogative to withhold [them]." (Id. at 16–17.)

But Schwartz is not asserting waiver, as he has repeatedly stated. (See Pl. Corr. Supp. Br. at 6; Apr. 29, 2015, Hr'g Tr. at 5:20–22.) By importing the waiver standard of official disclosure into Exemption 7(E), the DEA conflates two distinct legal doctrines. Publicly available information does not justify a withholding under Exemption 7(E) because "Congress did not intend that Exemption 7(E) apply to routine techniques and procedures which are generally known outside the Government." Lamont v. D.O.J., 475 F. Supp. 761, 780 (S.D.N.Y. 1979) (internal quotation marks omitted); accord Founding Church of Scientology v. N.S.A., 610 F.2d 824, 832 n.67 (D.C. Cir. 1979) ("Exemption 7(E), regarding 'investigative techniques and procedures,' . . . 'should not be interpreted to include routine techniques and procedures already well known to the public.'" (quoting S. Rep. No. 93-1200 (1974) (Conf. Rep.), reprinted in 1974 U.S.C.C.A.N. 6285, 6291)). By contrast, "when information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." Wolf v. C.I.A., 473 F.3d 370, 378 (D.C. Cir. 2007) (holding official disclosure waived FOIA exemptions that would otherwise protect classified information from disclosure) (internal quotation marks and citation omitted). Cases considering both doctrines analyze them as

separate and distinct legal issues. See, e.g., Touarsi v. D.O.J., 78 F. Supp. 3d 332, 347–51 (D.D.C. 2015).

Exemption 7(E) does not justify withholding publicly known information about techniques and procedures simply because such information has not been officially acknowledged. To the contrary, the cases interpreting Exemption 7(E) have required that such information be disclosed without considering whether it became public through official channels. For example, A.C.L.U. v. D.O.J. found that a D.O.J. memorandum discussing the application of recent Fourth Amendment jurisprudence to GPS tracking devices did not fall within the exemption because "[l]aw enforcement's use of GPS tracking is well known by the public." No. 12-CV-7412 (WHP), 2014 WL 956303, at *7 (S.D.N.Y. Mar. 11, 2014). In reaching that conclusion, the district court cited not official D.O.J. disclosures, but rather an article from Time magazine and Supreme Court dicta. Id. Likewise, in concluding that public knowledge of how law enforcement used cell site simulators pushed this information outside Exemption 7(E), A.C.L.U. of Northern California v. D.O.J. relied, in part, on the "extensive news coverage" on the government's use of cell site simulators. No. 13-CV-03127 (MEJ), 2015 WL 3793496, at *13 (N.D. Cal. June 17, 2015). Indeed, even those cases upholding the use of Exemption 7(E) make no mention of official acknowledgement. See, e.g., Bishop v. U.S. Dep't of Homeland Sec., 45 F. Supp. 3d 380, 390–92 (S.D.N.Y. 2014) (relying on articles from the New York Times and Washington Post); N.Y. Civil Liberties Union, 771 F. Supp. 2d at 291–93 (similar). The Court therefore concludes that the waiver standard in inapplicable to assessing the scope of Exemption 7(E) in this case.

In arguing that the withheld information is already publicly known (and therefore not subject to Exemption 7(E)), the plaintiff bears the burden of production. Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys., 463 F.3d 239, 245 (2d Cir. 2006). "This

is so because the task of proving the negative—that information has not been revealed—might require the government to undertake an exhaustive, potentially limitless search." Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency, 827 F. Supp. 2d 242, 254 n.72 (S.D.N.Y. 2011) (quoting Davis v. D.O.J., 968 F.2d 1276, 1279 (D.C. Cir. 1992)). The ultimate burden of persuasion, however, remains with the agency seeking to withhold the information. See Inner City Press, 463 F.3d at 245.

The DEA attempts to distinguish the publicly available materials cited by Schwartz. But these efforts largely miss the mark. The DEA focuses on factual distinctions between the operations discussed by those sources and the Ahuas operation, rather than discussing whether the techniques and procedures in those videos differ from those in the Ahuas Video. For example, the DEA notes that the Jamaica Video "was recorded during the daytime . . . in a heavily populated, residential neighborhood," (Fourth Soiles Decl. ¶ 29(A)), but does not dispute that it was ███████████████████████████████████████████.

Likewise, the DEA argues that Border Wars is distinguishable in that it "was recorded overtly" and "contains the briefest of glimpses of current recording technology . . . cropped in such a way that no data are visible." (Id. ¶ 29(B).) Notably, however, the DEA does not dispute (nor could it) that Border Wars discloses ███████████████████████████

███████████████████████████ or other relevant techniques and procedures. Instead of focusing on such factual distinctions, the Court evaluates each publicly available source Schwartz identifies to determine whether it discloses any of the techniques and procedures the DEA relies upon to justify its withholding under Exemption 7(E).

**B.    Techniques or Procedures Purportedly Disclosed in the Ahuas Video**

Before delving into the specific grounds on which the DEA withholds the Ahuas Video, the Court addresses a few preliminary arguments. First, the DEA argues that its statements

"regarding its law enforcement techniques and procedures are entitled to deference." (DEA Supp. Br. at 2–3.) But the Second Circuit has repeatedly instructed district courts to evaluate agency withholdings de novo, providing no deference to the agency's decision and resolving "[a]ll doubts . . . in favor of disclosure." Bloomberg, 601 F.3d at 147 (internal quotation marks and citation omitted); see also Long, 692 F.3d at 190. Center for National Security Studies v. D.O.J., on which the DEA relies, is not to the contrary. 331 F.3d 918 (D.C. Cir. 2003). That case stands not for the sweeping proposition that agency claims are always entitled to deference, but rather for the narrower "principle of deference to the executive in the FOIA context when national security concerns are implicated" regardless of what exemption the agency relies upon. Id. at 927–28. In law enforcement matters, an agency receive no deference and instead "bears the burden of justifying any withholding," which the Court reviews de novo. Long v. D.O.J., 479 F. Supp. 2d 23, 27 (D.D.C. 2007) (interpreting Center for National Security Studies).

Second, the DEA makes an additional claim that the protected techniques and procedures are invisible to those without the right equipment or sufficient experience. (See Fourth Soiles Decl. ¶ 51 ("The clarity of the events and of the techniques and procedures depicted on the video depends on the equipment on which the video is played and viewed."), ¶ 52 ("One's ability to perceive, understand, appreciate, and exploit what the video depicts depends on the experience of the viewer or the means of the viewer to solicit the assistance of an expert. To a novice, the video might be difficult or impossible to decipher.").) The Court certainly appreciates that although the DEA's decision to withhold material receives no deference, the DEA rather than the Court is expert in international drug trafficking. The DEA therefore might be able to identify techniques and procedures apparent with the right equipment or an experienced eye that the Court might not perceive. In solicitude of this fact, the Court provided the DEA with multiple opportunities to explain the Video and the techniques and procedures underlying it. These

opportunities included numerous rounds of briefing, an ex parte submission, and the Court's corresponding in camera review of the Video itself. Despite these opportunities and prompting, however, the DEA has not been able to identify to the Court what protected techniques or procedures the Video could reveal, even if only to an expert. FOIA does not permit the Court to rely on the DEA's unsubstantiated assertion that some such technique or procedure might be in some way discernable. See Bloomberg, 601 F.3d at 147; Long, 692 F.3d at 190. Instead the Court must conduct de novo review, and in doing so, the Court—even with the DEA's extensive expert guidance—cannot identify any protectable techniques or procedures.

Third, the DEA contends that Schwartz has failed to shoulder his burden of production because he failed to present "publicly available evidence [that] is [] identical to that in the withheld video, and . . . officially disclose[d]" by the DEA. (DEA Supp. Br. at 8.) As explained above, however, that is not the applicable standard here; that more restrictive standard is used to evaluate waiver claims. Since Schwartz does not assert waiver, official acknowledgement is not necessary. To satisfy his burden of production, Schwartz must only put forward information establishing a genuine dispute as to whether the techniques and procedures identified by the DEA are, in fact, generally known to the public. By providing substantial evidence, including more than a dozen similar videos, showing techniques or procedures similar to those the DEA claims to rely upon, Schwartz has met his burden. See, e.g., Wash. Post Co. v. U.S. Dep't of State, 840 F.2d 26, 28 (D.C. Cir. 1988) (concluding plaintiff satisfied his burden of production where he provided books and press accounts suggesting that the privacy exemption did not apply), vacated on other grounds by 898 F.2d 793 (D.C. Cir. 1990) (per curiam).

Having considered these preliminary questions, the Court turns to the specific grounds on which the DEA withholds the Ahuas Video. The DEA identifies a number of techniques and

28

procedures purportedly disclosed in the Ahuas Video, all of which fall into one of two categories: ones related to recording or operational ones.

1. Recording Techniques and Procedures

It is claimed that producing the Ahuas Video would disclose three types of techniques and procedures related to its recording.

a) Aircraft Used to Record the Ahuas Video

First, the DEA states that ████████████████████████████████████
████████████████████████ (Fourth Soiles Decl. ¶ 8.) However, as the DEA disclosed, there is only one surveillance video of the Ahuas Operation and it nowhere depicts the actual aircraft used to record the Ahuas Video. It is not apparent that any of the numbers and codes along the top and bottom reveal the type of aircraft used to record the Video, nor has the DEA explained to the Court how these numbers and codes might do so. Absent an explanation how releasing the Video would disclose the type of aircraft used to record it, the DEA fails to meet its burden to overcome the presumption of disclosure.

Further, even if the Ahuas Video expressly disclosed ████████████████████
████████████████, it is well known ████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ Indeed, in another suit filed by Schwartz, the DEA voluntarily produced the Jamaica Video, which was
████████████████████████████. See Letter from DEA to Hon. Brian M. Cogan dated Mar. 19, 2013, Schwartz v. DEA, No. 12-CV-6229 (BMC) (E.D.N.Y. Mar. 19, 2013) (hereinafter "Jamaica Case"), D.E. # 9 (stating that the DEA produced the Jamaica Video to Schwartz); Letter from CBP to Schwartz dated Sept. 26, 2012 (disclosing that ████████████████████
████████████████████), Jamaica Case, D.E. #1-2 at 18; CBP Significant Incident

Report dated May 24, 2010, <u>Jamaica Case</u>, D.E. # 1-2 at 21–22 (same); Letter from S. Suzuki, Chief of CBP's FOIA Appeals, Policy & Litigation Branch dated Feb. 8, 2012, <u>Jamaica Case</u>, D.E. # 1-2 at 31 (same). To the extent that the DEA contends that ███████████ ████████████████████████████████████████constitutes a technique or procedure, its argument is not persuasive.

      b)    <u>Camera Equipment Used to Record the Ahuas Video</u>

The DEA makes a brief argument that disclosure would reveal the types of cameras used in surveillance and how those cameras are used in nighttime interdiction operations. (Fourth Soiles Decl. ¶¶ 18–20.) The DEA does not elaborate, stating only that the Ahuas Video reveals (1) "how the recording equipment is used at night," (2) "the unique positioning of the surveillance assets with respect to their targets during nighttime operations," and (3) "[t]he way law enforcement uses [the] cameras during anti-drug operations." (<u>Id.</u> ¶¶ 18, 20(b).)

Again, the DEA identifies nothing on the face of the Ahuas Video that discloses such information. At most, the Video reveals only a record of how equipment, cameras, and surveillance assets were used in this particular operation ████████████████████ ██████████████████████████████████████ To the extent the DEA argues that the Ahuas Video provides a single data point that allows viewers to extrapolate underlying law enforcement techniques or procedures governing similar operations, that argument is not compelling. In its many opportunities to do so, the DEA has not identified how this single recording reveals broader underlying techniques or enables a viewer to extrapolate these techniques. The DEA has also not identified what techniques and procedures might be revealed, including to the Court in its <u>ex parte</u> submission. In one representative example, the DEA states that the video reveals "the unique positioning of the surveillance assets." (<u>Id.</u> ¶¶ 18–20.) But the DEA does not explain how the Video does so, and the Court's review of the Video

does not make this clear: ███████████████████████████

████████████████████████████████████████████████

████████████████████ (See id. ¶ 34.) Moreover, the DEA has declined to explain

how such "positioning of the surveillance assets" can be "unique" but also revelatory of broader

unknown techniques and procedures.

And taken at face value, the DEA's argument largely cuts against its position: if a single

recording of a nighttime operation reveals the recording techniques and procedures employed by

CBP, the multiple publicly available nighttime recordings that Schwartz identified have already

made any such recording techniques and procedures public. (See First Wedoff Decl. ¶¶ 21, 23;

Second Wedoff Decl. ¶¶ 4, 6–11, 13, 29.) The record contains multiple examples of public

footage recorded by CBP of drug interdiction operations both during the day and at night. The

Border Wars video, for example, includes footage of nighttime anti-drug operations ███████

█████████████████████. (Second Wedoff Decl. ¶ 13.) Likewise, the CBS News video

entitled "The Search for Drugs in Puerto Rico" is a more-than-four-minute-long aerial recording

taken by a CBP aircraft detailing two nighttime intercepts of smuggling boats off the coast of

Puerto Rico. (Id. ¶ 29.) Schwartz provides at least nine additional surveillance videos of

nighttime drug interceptions, each of which appears to have been captured by ████████████

█████████.[7] (See First Wedoff Decl. ¶¶ 21, 23; Second Wedoff Decl. ¶¶ 4, 6–11.) Schwartz

points to a number of additional videos depicting how law enforcement uses surveillance

equipment during similar operations conducted during the day.[8] (See Jamaica Video; Second

Wedoff Decl. ¶¶ 3, 5, 12.) One particularly notable example, the Jamaica Video, ██████████

---

[7] Each of those nighttime videos indicates that it was recorded by a CBP-operated surveillance plane—either by including a notation on the footage itself or in the accompanying description—████████████████████. (See Second Wedoff Decl. ¶¶ 4, 9.)
[8] Similarly, each of those four daytime videos was recorded by CBP██████████████. (See Jamaica Video; Second Wedoff Decl. ¶ 3.)

██████████████ captures a daytime raid less than 600 miles from the site of the Ahuas Operation.

As such, the Court concludes that the DEA has not overcome the presumption of disclosure. Neither its public filings nor its ex parte submission were able to explain what techniques and procedures would be revealed by the Ahuas Video, nor was the Court able to discern any such techniques or procedures from its in camera review. Even when reading the DEA's explanations as broadly and generously as possible, any law enforcement techniques and procedures potentially disclosed by the Ahuas Video are already publicly known and therefore cannot be withheld under Exemption 7(E).

      c)      Technological Capabilities and Limitations of the Recording Equipment

Next, the DEA states that the Ahuas Video reveals the technological capabilities of the cameras used to record it, specifically that ██████████████████████ ████████████. (Fourth Soiles Decl. ¶¶ 20(c), 21, 23.) Similarly it claims that the Ahuas Video would reveal the limitations of those cameras by making plain the images they can capture and those they cannot. (Id. ¶¶ 22, 26–27.)

The existence of ████████████ is, however, widely known to the public. Indeed, ████████████████████████████████████████████████ ██████████████████████████████████ In addition, as noted above, Schwartz has identified at least 11 examples of publicly available surveillance videos ████████████ ████████ in the context of a drug interdiction operation████████████████ ████████████████████████████ To take just one example, the Border Wars video clearly shows surveillance footage ██████████████████████████████. (See id. ¶ 13.) As such, the fact that the Ahuas Video ████████████████████ cannot justify a withholding under Exemption 7(E). See Rosenfeld, 57 F.3d at 815 (affirming production order

where the technique in question was so obvious that it "would leap to the mind of the most simpleminded investigator" (citation omitted)).

Similarly, it is public knowledge that law enforcement is generally able ████ ████████████████████████████████████. Most of the video footage identified by Schwartz depicts the use of such a feature. ████████████████████████ Again looking to <u>Border Wars</u> as an example, it reveals that ████████████████████████ ████████████████████████████████████████████████ Likewise, ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Therefore, the fact that ████████████████ ████████████████ cannot justify the DEA's withholding the Ahuas Video.

To the extent the DEA claims that the technological capabilities of this particular camera exceed those previously disclosed, that assertion is not supported. With ample opportunities to do so, including an <u>ex parte</u> submission, the DEA has not identified any technical details that the Ahaus Video would disclose. Nor could the Court discern such technical information by viewing the Ahaus Video <u>in camera</u>. To the contrary, the Court could not detect any technical information about the camera's capabilities that is not already publicly known. The DEA asks the Court to distinguish the Ahaus Video from publicly available recordings because the camera used here is "state-of-the-art." (Fourth Soiles Decl. ¶ 20). But the presumption of disclosure cannot be overcome by this conclusory assertion alone.

Finally, the DEA states that disclosing the Ahaus Video would reveal the limitations of its surveillance capabilities. It is not clear that Exemption 7(E) protects "limitations." Even assuming that Exemption 7(E) is applicable, the DEA has not established that the Ahaus Video would in fact disclose the limitations of its surveillance equipment. The DEA seems to argue

33

that viewers can deduce such limitations by observing the choices made by law enforcement and noting the things that went unseen in the surveillance video. But the DEA does not explain what actions shown (or not shown) by the Video reveal surveillance limitations, what those limitations are, or how deducing those limitations then reveals a protectable technique or procedure. Without such guidance or explanation, it is difficult for the Court to conclude that the Video would reveal these unspecified technological limitations of the recording equipment, which would subsequently reveal how the DEA conducts surveillance.[9]

And to the limited extent the Ahuas Video might conceivably reveal any limitations by implication, those limitations are already publicly known, as Schwartz has introduced at least five similar videos ███████████████. ████████████████████████████████████ ████████ The DEA does identify factual differences between the Ahuas Video and these publicly available videos, but it does not materially distinguish any alleged surveillance limitations disclosed in those publicly available sources from those that would be conceivably disclosed by the Ahuas Video. (See Fourth Soiles Decl. ¶¶ 29(A)–(B) (discussing a number of factual differences between the requested Video and the Jamaica Video or Border Wars, but failing to explain how the technical limitations disclosed in the latter two are distinct from those disclosed in the requested one).) To the contrary, Border Wars expressly discloses such limitations by noting that "even with all this state-of-the-art technology finding a small boat out here is not easy" and that "smaller targets . . . barely register[]" ██████████████████████ ████████. (Second Wedoff Decl. ¶ 13.) Therefore even limitations it might be possible to infer from the Ahuas Video, viewed as broadly as possible, are publicly—indeed expressly—disclosed elsewhere.

---

[9] The likelihood that the Ahuas Video would reveal the limits of CBP's recording capabilities seems particularly low as the footage here was recorded more than three years ago.

The Court therefore concludes that the DEA has not made the showing required to permit withholding the Ahuas Video under Exemption 7(E) with respect to information related to the limitations of the surveillance equipment used.

                  d)     On-Screen Data

Finally, the DEA seeks to withhold the Ahuas Video based on the "on-screen data [that] appear in the text on the perimeter of each video frame." (Fourth Soiles Decl. ¶ 15.) According to the DEA, release of that data would reveal how ▮▮▮▮▮▮▮conducts surveillance by disclosing the "[t]he specific vantage point" of the aircraft; "[t]he altitude, directional positioning, airspeed, and distance from which law enforcement conducts its surveillance"; [h]ow law enforcement evades detection"; and the aircraft's "flight pattern." (Id.) The Court agrees that producing specific flight data might reveal a protected technique or procedure, but cannot agree that such data are "inextricable" such that the Ahuas Video may be withheld in full. To the contrary, review of the publicly available videos identified by Schwartz reveals that such data could be redacted before videos are produced. (See, e.g., Second Wedoff Decl. ¶ 10 (on-screen data redacted).) The Court therefore concludes that while the on-screen data may be withheld by way of redactions under Exemption 7(E), the footage must still be produced.[10] See 5 U.S.C. § 552(b).

           2.     Operational Techniques and Procedures

Next, the DEA identifies six techniques or procedures related to its interdiction operations that would purportedly be disclosed if the Ahuas Video were made public.

---

[10] It is unclear whether the techniques or procedures implicated by the on-screen data are already publicly known. The DEA previously produced the Jamaica Video to Schwartz without redacting similar on-screen data, and similar on-screen data are clearly visible in the video titled "The Search for Drugs in Puerto Rico." (See Jamaica Video; Second Wedoff Decl. ¶ 29.) But because this issue was not specifically briefed, the Court declines to decide it at this time. Rather, if Schwartz objects to the redactions of the on-screen data, he may file a supplemental submission seeking to have them lifted.

a)    Number of Surveillance Aircraft Used

The DEA claims that the Ahuas Video discloses ███████████████ ████████████████████████████████████████████████████ Similar to its other bases for withholding, the DEA provides no citation to specific portions of the Ahuas Video to support this claim, nor does it explain, even in general terms, why viewing the Video would disclose this information. The DEA therefore offers essentially no guidance to the Court's review of the Ahuas Video. In that review, the Court cannot find support for the DEA's contention. Nowhere does the Video disclose ████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████. Nor is it dispositive that ████████████████████ ████████ To the contrary, the DEA has repeatedly stressed that the CBP-operated surveillance planes use techniques and procedures designed for surveillance to be conducted covertly. As such, ████████████████████████████████████████ does not necessarily mean that ██████████████████. Although given numerous opportunities to do so, the DEA has not offered any further explanation to guide the Court and thereby carry its burden.

Additionally, the DEA has not explained how ████████████████████████ ████████████████████ constitutes a protected technique or procedure. The DEA nowhere provides any evidence that either it or CBP assigns a certain number of surveillance craft to a mission based on particular techniques or procedures that are unknown to the public. Nor does the DEA claim that ████████████████████████████████████ was the result of such a protocol. Therefore the Court cannot conclude that ████████████████████████ ███████████ justifies an Exemption 7(E) withholding.

Even if the Ahuas Video did disclose the number of surveillance craft used for the Ahuas Operation, and even if that information did constitute a technique or procedure, such information is publicly known. ███████████████████████████████████████████████

████████████████████████████████████████████ Similarly, Schwartz identified a number of other publicly available recordings that ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ Those videos establish that it is publicly known that CBP █

████████████████████████████████ to surveil drug interdiction operations on the

DEA's behalf. Exemption 7(E) therefore cannot justify withholding.

████████████████████████████████████

The DEA proffers similar arguments to claim that the Ahuas Video ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ This claim does not carry the DEA's burden for the same reasons discussed above. The DEA does not explain how the Video discloses this fact. It does not guide the Court to where or what in the Video might disclose this fact. It does not indicate to the Court what protected procedure or technique this fact would then expose. Reviewing the Video, the Court can find no evidence that it discloses that ████████████████████████████████████

████████████████████████. The ████████████████████████████████████████████

████████████████████████████████████. Therefore the Court cannot

conclude that the Ahuas Video discloses ████████████████ that might provide a basis for an Exemption 7(E) withholding.

c)    Law Enforcement Assets and Equipment

Next, the DEA contends that publicizing the Ahuas Video would reveal details on the type and number of law enforcement equipment deployed in the Ahuas Operation. (Fourth Soiles Decl. ¶ 38(a), (j)–(k).)

The DEA has not explained what the Video exposes about the type of aircraft used for the Operation that constitutes an unknown protectable technique or procedure. The Court's own review discovered only ███████████████████████████████████. The DEA has not explained how ██████████████ could be withheld. It does not claim that the ██████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ To the extent that ███████████████ qualifies as a technique or procedure, such information is undeniably public knowledge as revealed by ███████████████████████████████████ ███████████████████████████████████████████████ ███████████████ The ██████████████ therefore cannot support withholding the Video.

Similarly, the DEA has not supported its claim that the Ahuas Video would disclose the number of law enforcement assets, ██████████████ and agents that were deployed in the Ahuas Operation. The grainy video footage simply does not disclose the number of agents involved in the Operation, ███████████████████████████████████████████████ ████████████████████. Although media sources have speculated about the number of law enforcement agents ██████████████, the Ahuas Video does nothing to confirm those suspicions. ████████████████████████████████. The Ahuas Video often jumps from location to location leaving a viewer unable to either assess the number of agents on the ground or track the actions of particular agents.

To the extent ██████████████ used in a particular mission constitutes a technique or procedure, that technique has been repeatedly disclosed. Schwartz ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██ The DEA fails to explain why ██████████████████████████ would be protected under Exemption 7(E) and after reviewing the Ahuas Video, along with the publicly available videos, the Court cannot deduce a reason sufficient to justify withholding under Exemption 7(E).

### d) Law Enforcement's Approach and Landing

The DEA further claims that the recording would disclose details about where, when, and how the aircraft chose to approach the suspected traffickers and ultimately to land. (Fourth Soiles Decl. ¶¶ 38(b)–(i), 38–39.))

The DEA has not explained, however, how the purported details about the manner in which agents approached and ultimately landed near the traffickers are revealed in the Ahuas Video. Several of the factors listed are not depicted in the surveillance video at all. For example, the Video does not reveal ██████████████████████

██████████████████████████ because the Video does not reveal ████████

████████████████████████████████████████████████████████████

██████████ The Video similarly does not identify ██████████████████

████████████████████████████████████████████████████

██████████████████ For those factors that the Video does show, the DEA has not explained to the Court how they constitute law enforcement techniques and procedures or allow viewers to deduce techniques or procedures. For example, the DEA does not explain—and the Court cannot itself see—how the "type of terrain" or "[p]otential obstacles and hazards to law

39

enforcement's aircraft" could constitute a law enforcement technique or procedure. (Id. ¶ 38(c), (e).) It is not as though law enforcement selected the location of the Ahuas Operation: the agents here intercepted the suspected traffickers on their own turf, rather than arranging a sting at a controlled location. The DEA offers no elucidation on how the factors it points to constitute techniques or procedures.[11]

The DEA has failed to establish any facts suggesting that the remaining details related to the approach and landing reveal techniques and procedures. For example, the DEA identifies no techniques or procedures governing "[t]he distance from the violators" or the "length of time between the landings of law enforcement's aircraft." (Id. ¶¶ 38(f), (h).) From the Court's review, such a technique or procedure cannot be deduced from the Video. Therefore Exemption 7(E) does not protect the Video from production on that basis.

e) Tactical Interactions Between Law Enforcement Assets & Personnel

The DEA next claims that the Ahuas Video is exempt because it "clearly shows the tactical interactions by law enforcement assets, including air, water, and ground personnel participating in the [Ahuas] [O]peration." (Fourth Soiles Decl. ¶ 41; see also id. ¶ 35.) Specifically, it contends that the Video discloses how those various law enforcement "assets and personnel communicate during such operations," their ability to "adjust to certain operational developments," the limitations of that ability, the available options, and the time required to make such adjustments. (Id. ¶ 41(a)–(e).)

A number of these purported techniques and procedures appear nowhere in the Ahuas Video. ███████████████████████, it does not disclose any communications between the

---

[11] To the extent the DEA instead means to argue that the Ahuas Video would reveal how it reacted to the geographical hazards, it has not explained how the Video reveals this fact or how this fact constitutes a technique or procedure. At most, the Ahuas Video shows ████████████████████████████████████████.

various law enforcement personnel involved. Similarly, unlike an after-action report or mission summary, a video cannot disclose either the paths not taken by law enforcement—i.e. the "options available to [them]"—or the "limitations of [their] ability to adjust to operational developments." (Id. ¶ 41(d)–(e).) The recording shows only what the agents actually did, not what they might have done or what they might have wished to do. Since the Video likewise does not disclose when the agents actually learned of operational developments, a viewer cannot deduce "[t]he amount of time it takes for law enforcement assets to adjust" to those unexpected events. (Id. ¶ 41(c).)

Even assuming that such response times were disclosed in the Video, the DEA has not explained how that factual detail would constitute or reveal a protected technique or procedure. The DEA essentially acknowledges that no technique or procedure was involved in a partially redacted Report of Investigation from its Office of Inspections that it disclosed to Schwartz, which states: "The incident on the river involving [redacted] occurred so quickly that it was over prior to any FAST personnel being able to maneuver to a position where they could return fire. [Redacted] stated that when his boat was fired upon [redacted] and never heard the second boat approach until it was too late. The [redacted] masked the noise of the second boat." (First Wedoff Decl. Ex. G at 88.) Because the DEA has already disclosed that the quick moving events on the river—not a protected technique or procedure—limited its ability to respond, Exemption 7(E) is inapplicable.

Finally, the DEA has failed to explain how the remaining specific claim, "[t]he flexibility and ability of law enforcement assets to adjust to certain operational developments," is a technique or procedure. (Id. ¶ 41(b).) Absent an explanation, the Court cannot see how this might be so. "[F]lexibility and ability" does not describe how law enforcement investigates a crime, but rather their capacity to respond to unforeseen developments. There may be techniques

41

or procedures that the DEA employs to ensure that its agents have sufficient capacity to respond to changes in the field, but the DEA does not indicate how the Ahuas Video reveals such information. Nor is any such information apparent from the Court's review. Moreover, the DEA does not explain either what "operational developments" occurred in the Ahuas Operation or how the agents in question responded. The only such development that the Court could discern on its own was ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████. In fact, the DEA has explicitly disavowed any claim that the use of force against Honduran civilians is a protected technique or procedure. (See DEA Supp. Br. at 9 n.4.) The DEA has therefore failed to satisfy its burden to show that law enforcement's responses to so-called "operational developments" constitute previously unknown techniques or procedures protectable under Exemption 7(E).

████████████████████████████████████████████████████████████████

on the other hand, fall outside Exemption 7(E) because ████████████████████████

████████████ is well known to the public. The publicly available sources that Schwartz relies upon make that point plain. For example, Border Wars shows ████████████████████████

████████████████████████████████████████████████████████████████

████████████ "The Search for Drugs in Puerto Rico" similarly shows ████████████████████

████████████████████████████████████ Indeed, the majority of videos cited by Schwartz include ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ As such, ████████████████████████████████

████████████ without more, cannot justify an Exemption 7(E) withholding.

f)    Law Enforcement Objective

The DEA next argues that the Ahuas Video reveals that law enforcement's objective in

the Ahuas Operation ███████████████████████████████(Fourth

Soiles Decl. ¶ 36.) The DEA does not explain how the Ahuas Video reveals this fact. Even if it

shows ████████████████████████████████, the DEA

does not explain how this fact reveals the mission's objective. Further, the DEA does not

explain how the mission's objective, even if interpretable from the Video, discloses an unknown

technique or procedure. Even assuming knowledge of this objective, the Court could not identify

a procedure or technique emerging from it on reviewing the Video. The DEA has not explained

what technique or procedure the mission's objective might disclose; if the DEA is understood to

argue that ██████████████████████████████, it has

produced insufficient evidence to support this (somewhat difficult to believe) proposition. To

the contrary, ████████████████████████████████

████████████████ The DEA has therefore failed to show how the Video reveals

the mission's objective, how identifying that objective could reveal a technique or procedure, or

what that technique or procedure might in fact be.

g)    Assignment of Agents to Particular Law Enforcement Tasks

The DEA further justifies its withholding of the Ahuas Video by claiming that it would

reveal "[t]he specific tasks undertaken by on-the-ground law enforcement" and "[h]ow many law

enforcement officers were deployed for each of the different on-the-ground tasks." (Fourth

Soiles Decl. ¶ 40.) As with the DEA's other bases for withholding, these claims are

insufficiently explained despite the DEA's numerous opportunities to do so. It has not identified

how or when in the Video the tasks of agents are identified or how many agents perform each

task. It has then failed to explain to the Court how these factual instances demonstrate or

allowed to be deduced a technique or procedure. And it has not stated what exactly the DEA technique or procedure being employed is.

The Court has tried to discern any such procedure during its own in camera review. But the gritty and often unclear footage of the Ahuas Video renders it essentially impossible to discern either the tasks performed by the various law enforcement agents or the number of agents assigned to each task. The Ahuas Video ███████████████████████████████ ██████████████████████████████ But the DEA has not explained how such a task constitutes a technique or procedure. Without any further guiding explanation by the DEA in its numerous submissions about how techniques or procedures could be evident from the footage, the Court can only conclude that the Video does not reveal any such protected technique or procedure.

████████████████████████████

Finally, the DEA justifies withholding the Ahuas Video by stating that production would reveal ████████████████████████████████████████████ ████████████████ Specifically, it claims that the Video ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████

The DEA, however, has itself previously disclosed ███████████ to the public. In an official letter from the DEA's Deputy Chief of Congressional and Public Affairs to Congressman Henry C. Johnson dated July 29, 2013, the DEA explicitly stated that the Ahuas Operation was "planned, coordinated and executed with input and agreement from [the Department of State] . . . and the [Government of Honduras]." (First Wedoff Decl. Ex. J at 2.) The DEA also made plain that ██████████████████████████████████████████████████



■■■■ Similarly, the DEA disclosed ■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■ Moreover, ■■■■■■■■■■■■■■■■■■■■■. Most notably, ■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■ Given the clear public knowledge of ■■■■■■■■■■■■■■■■ Exemption 7(E) does not protect the Ahuas Video from disclosure on that basis.

\*\*\*

Despite its many submissions and filings, and the Court's consideration of an ex parte declaration and in camera review of the Video itself, the DEA has not carried its burden to show that the Ahuas Video is permissibly withheld under Exemption 7(E). Accordingly, the DEA has not overcome FOIA's presumption of disclosure and must disclose the requested portion of the Video, subject only to the redaction discussed above.

### III. Bad Faith and Adequacy of the DEA's Search

In opposing the DEA's motion, Schwartz argues that the DEA failed to conduct an adequate search and acted in bad faith in responding to his request. However, Schwartz has not contested the DEA's statement that the Ahuas Video is the only responsive video, (see DEA Reply Br. at 2 n.1), and therefore his challenge to the DEA's search is inapplicable to the subject of this opinion. Moreover, there is no need to address bad faith here, because the Court orders the requested portion of Video disclosed on other grounds. The Court therefore need not consider here Schwartz's challenges to the DEA's conduct.

45

## CONCLUSION

For these reasons, the Court denies the DEA's motion for summary judgment and grants Schwartz's cross-motion seeking production of the requested portion of the Ahuas Video, subject to the redaction discussed above. The DEA is directed to produce the requested portion of the Ahuas Video as ordered redacted to Schwartz within 14 days of this Order.[12]

SO ORDERED.

Dated: January 8, 2016
       Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge

---

[12] To avoid any doubt, the Court directs the DEA to produce all footage after minute 3:15 of the file entitled "IR20120511T071451_1."